UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____ X

RODERICK GUNN,

        Petitioner,        14-CV-3228 (WHP) JUN 2 0 2014

        -vs-            06-CR-911 (WHP)

UNITED STATES OF AMERICA,    PRO SE OFFICE

        Respondent.

_____ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#_____
DATE FILED: 6/20/2014

MOTION FOR LEAVE TO SUPPLEMENT 2255

PETITION PURSUANT TO FED.R.CIV.P. 15


Petitioner Roderick Gunn respectfully moves this Court for leave, pursuant to Rule 15 to Supplement his previously filed 2255 habeas petition with the following issues:


Ground Two Supplement: Ineffective Assistance of Counsel


E. Counsels Failed To Raise Due Process Napue Claim


This Napue claim concerns the government's use and benefits from Needham's false testimony on the planning stages of the Wickham Avenue attempted robbery knowing that such testimony was false, and allowed it to go uncorrected before the jury. This claim is supported by proffer notes Gunn obtained after counsel Howard Jacobs retired from his practice of law. See Exhibit A (Needham's Proffer Statement, dated 8/25/09). The first page of her proffer notes states:

Petrainne told Michelle that vict has $- Michelle tells D- D
talks w/ Petrainne about B- Also D talks w/ B - B in
Rochester. See ¶4 of Exhibit A first page. The letter "D"
refers to Needham, while vict refers to Gary Grey.

The second page of her proffer notes states:  Petrainne
Aldridge- approaches D w/ Job- sleeping w/ target who kept $
in safe- drug DLR. See ¶1 of Exhibit A second page.
-D calls B w/job- B in Rochester. See ¶3 of Exhibit A second
page.

In ¶1 of Exhibit A first page, Needham informed the government
that Petrainne approaches her with the Wickham Avenue robbery
job. Then in ¶3 of the second page, Needham stated that she
called B (Davis) with the job while he's in Rochester. This
fact that Needham set up the Wickham Avenue robbery was
corroborated by Ronald Knibbs Proffer Notes. See Exhibit B. In
the top left corner of Knibbs Proffer notes in the section,
[WHO SET UP JOB], the name Ingrid is listed, who is Needham.
However, at trial, the government allowed Needham to testify
falsely that Davis set up the Wickham Avenue robbery to
minimize her role in the crime. This act deceived the jury and
prevented the jury from properly assessing Needham's
credibility. See for example, trial colloquy between AUSA John
O'Donnell and Derrilyn Needham, appears at Exhibit C, page
399.

Q. How did you first learn about the robbery?

A. I first learned about the robbery through B.

Q. How did you learn about the robbery from Mr. Davis?

A. He called me up and he told me that my niece,
   Michelle Wind, has told him that his niece Petrainne,
   told him about some older guy she was dating and
   that the guy was a drug dealer and that she
   had seen on more than one occasion the guy taking
   money from a safe in a home she would go visit him
   at and putting money in the safe.

Q. How old was this niece?

A. 15

Q. And he was passing along information he learned
   from his niece?

A. Yes, he was.


The trial colloquy proved that Needham was allowed to
testify falsely that she first learned about the robbery
through B, when her August 25, 2009 proffer notes revealed
that she first learned about the robbery through Petrainne,
who approached her with the job, then she called B about the
job. Needham was allowed to shift her planning role of the
Wickham Avenue crime to Davis and Petrainne, in the same
manner she was allowed to shift her planning role of the
Elmont Avenue crime to Gunn.  Counsels were well aware of this
Napue due process violation, but neglected their Sixth
Amendment duty to object the falsehood in the trial court, and
failed to raise this violation in the Court of Appeals.

In Napue v. Illinois, 360 U.S. 264 (1959), the Supreme Court held that due process is violated when the prosecutors knowingly either solicit false testimony or permit it to go uncorrected. Napue requires a new trial if "the false testimony could...in any reasonable likelihood have affected the judgment of the jury." See Giglio v. United States, 405 U.S. 150, 154 (1972).

In Napue, the cooperating witness testified on direct examination that no promises were to him by the judge, the prosecutor or any representatives of the State, for a reduction of his 199-years sentence. It was later revealed that his testimony was false, and under such circumstances, the U.S. Supreme Court concluded: "[I]t is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," Mooney v. Holohan, 294 L. Ed 791. "The principle that a State may not knowingly use false evidence, including false testimony to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." Quoting from People v. Savvides, 1 NY2d 554, 557, the Supreme Court further held: "[I]t is of no consequences that the falsehood bore upon the witness' credibility rather than directly upon the defendant's guilt. A lie is a lie, no matter what its subject, and if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.... That the district attorney's silence was not the result of guile or a desire to prejudice

the trial matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair. We do not believe that the fact that the jury was apprised of other grounds for believing that witness Hamer may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one."

In this case, Needham's false testimony was relevant to the jury assessment of her credibility and her true role in the offense-- a fact firmly established by the Supreme Court in Banks v. Drekte, 157 L. Ed 2d 1166 (2004). In Banks, the Supreme Court held that, "[a] witness role in the offense was relevant to the jury assessment of the case. One can hardly be confident that Banks received a fair trial, given the jury's ignorance of Farr's (a government witness) true role in the investigation and trial of the case." See also, Kyles v. Whitley, 514 U.S. at 434 ("the question is not whether the defendant would more than likely not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence").

Gunn had raised such claim in his post verdict motion (Rule 29/33) concerning Needham's false testimony about the planning of the Elmont offense, but the court rejected his claim as harmless because he was acquitted for the Elmont robbery count. However, same conclusion cannot be said for this Napue claim, because Gunn was found guilty for the Wickham Avenue robbery. It was critical for the jury to hear the truth,

because a great portion of Needham's testimony on what transpires in the Wickham Avenue location was based on what she alleged that Davis or Gunn discussed at her house [after] the Wickham Avenue crime. Gunn had argued in his Rule 29/33 motion that Needham lied that everyone met up at her house after the Wickham Avenue crime. Knibbs' proffer (Exhibit B) supports Gunn's claim. Deliberate deception of a court and jury by the presentation of known false evidence is incompatible with rudimentary demands of justice. United States v. Agurs, 427 U.S. 97, 103 (1976)("The [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"), Napue, 360 U.S. at 269; Mooney v. Holohan, 294 U.S. 103, 112 (1935)(condemning "deliberate deception of court and jury by the presentation of testimony known to be perjured"); Mills v. Scully, 826 F.2d at 1195 ("It is sufficient if [a] government attorney knows about the false testimony and no steps are taken to correct it"). See also, Shih Wei Su v. Filion, 335 F.3d 119 (2d Cir 2003). The Supreme Court held in Napue that "the jury's estimate of the truthfulness and reliability of a given witness may well be determined of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Id Napue, 360 U.S. at 269.

In a situation as presented here with Needham's false testimony, the Second Circuit held in Jenkins v. Artuz, that a "heightened opportunity for prejudice occurred [since] the prosecutor...[was] complicit in the untruthful testimony." 294 F.3d at 295. As found in Shih Wei Su and Jenkins, it would be an unreasonable application of the standard for prejudice clearly set out by the Supreme Court, in cases like Napue, Giglio, and Agurs, to find insufficient prejudice in this case. The prosecutor's act of eliciting false testimony to obtain his conviction, and his failure to correct this falsehood was a serious violation of Gunn's Fifth Amendment due process rights, and his Sixth Amendment right to a fair trial. On the other hand, it was counsels duty to challenge this due process violation at trial, or raised it on appeal, and failure to do so constitutes ineffective assistance of counsel. Had counsels raised this claim at trial, there is a reasonable probability that the Government's case would have been undermined, or Gunn would have prevailed on appeal under Napue, United States v. Cruz, 981 F.2d 659, and United States v. Castillo, 924 F.2d 1227, 1231 (2d Cir 1991). As such, this claim demands a new trial.

F. Counsels Failed To Challenge Admissibility
   Of Expert Witness Under Fed.R.Evid. 403

At trial the government moved the court for an order to qualify Special Agent Baldus as an expert witness to testify on the subject of marijuana, specifically in the areas of

growing, transportation and packaging. Counsels did not object after the voir dire, and the court granted the Government's motion under Fed. R. Evid. 702. During Agent Baldus's voir dire, he testified that he had no firsthand knowledge of the facts and circumstances of the case. See Trial Transcripts at pg. 739. To qualify as an expert witness, the probative value of Baldus' testimony must meet all rule 702 requirements, while the admissibility of his expert testimony must satisfy Rule 403 gate keeping requirements.

Sub-clause (3) of Rule 702, phrased with the conjunctive [and] in support of sub-clause (1) or (2), was never satisfactorily met for the court's determination on the admissibility of Baldus' expert testimony. Baldus admission that he had no firsthand knowledge of the facts of the case was sufficient to disqualify him as an expert witness under 702(3). Baldus had no knowledge of Grey's alleged marijuana business, type of marijuana Grey allegedly sold, and location where Grey's marijuana allegedly came from. The Government seek the admissibility of this expert witness testimony to bolster Knibbs' testimony that Grey sent out his money to purchase marijuana--an inference Knibbs created from the term "money gone to market." See United States v. Cruz, 981 F.2d 659 (2d Cir 1992), in which the Second Circuit reversed a conviction based on the use of expert testimony to bolster another witness' testimony.

Here, Baldus' testimony provided the same effect as that occurred in Cruz. In Cruz, the Government used an expert

testimony to show the jury how drug operations are run in a
particular area, the same content of another witness'
testimony. The Second Circuit rejected the prosecutor's
reasoning for the use of this expert testimony, condemning it
as "impermissible." See also, United States v. Castillo, 924
F.2d 1277, 1231 (2d Cir 1991). In the Castillo case, the
government elicited testimony from an officer as to various
routine acts in drug transactions--for example, the use of
guns and the forcing of customers to snort cocaine to weed out
undercover officers--and then argued that the defendants were
guilty because the government's witness testified that the
defendants used guns and forced an undercover officer to
snort cocaine. The Second Circuit held in response that "the
credibility of a fact-witness may not be bolstered by arguing
that the witness's version of events is consistent with an
expert's description of patterns of criminal conduct, at least
where the witness's version is not attacked as improbable or
ambiguous evidence of such conduct.

In this case, the government argued that Baldus' testimony
about marijuana growth in Mexico supports Knibbs' testimony
that Grey sent his money to market, and as such, the
interstate nexus was satisfied. However, it is this type of
bolstering of experts' testimony that Cruz and Castillo had
condemned. The Second Circuit expressly held in Castillo that,
"[g]uilt may not be inferred from conduct of unrelated
persons." Id at 1234. The Castillo court further held that,
"although such expert testimony logically adds nothing to the
believability of a witness's account (again absent a

suggestion of implausibility), it strongly suggests to the
jury that a law enforcement specialist to be credible, a
suggestion we have previously condemned," citing United States
v. Scop, 846 F.2d 135, 139-43 (2d Cir 1988).

Baldus' testimony was relied upon heavily in the
government's summation and the Courts' Memorandum and Order
affirming the judgment. The district court and the appellate
court's judgment are grounded on Knibbs' testimony that (1)
Grey sent money to market, and (2) Baldus' testimony that
marijuana is commonly grown in Mexico and trucked to New York.
The courts bootstrapped Baldus' testimony to the term "money
gone to market" and concluded from these two inferences, that
the interstate nexus element was sufficiently proved beyond a
reasonable doubt. It is evident that the prejudicial nature of
Baldus' testimony substantially outweighed the probative value
for its admission. Counsels were required under the Sixth
Amendment to object to his admissibility as an expert witness,
yet failed to do so. As a result, Gunn was prejudiced by
counsel's failure to object Baldus' admissibility as an expert
witness.

Fed.R.Evid., 403, permits courts to exclude relevant
evidence on grounds of prejudice ... if its probative value is
substantially outweighed by the danger of unfair prejudice.
Counsels failure to object to Baldus' qualification as an
expert witness was ineffectiveness on the grounds that (1)
Robert Deleon had already testified that the marijuana he sold
came from California, and (2) he testified in general terms

about the mode of packaging and transporting marijuana from California to New York. Baldus' testimony only reiterated what Deleon testified to, except for the fact that all his (Baldus') marijuana investigations concerns marijuana that was grown in Mexico. Thus the probative value of Baldus' testimony was substantially outweighed by the unfair prejudice suffered by Gunn. Baldus' expert testimony did not produce any additional facts to assist the jury in its assessment, which was not otherwise presented. For instance, Deleon's testimony had produced all the facts on marijuana growth, packaging and transportation. Thus, Baldus' testimony did not aid the jury as required by Rule 702 to assist the trier of fact to understand the evidence or to determine a fact in issue. Thus, the jury may have drawn improper inference that because (1) Baldus is an expert, (2) Baldus' marijuana investigations dealt only with marijuana that was grown in Mexico, and (3) Grey sent his money to market--the interstate commerce element was satisfied.

Counsels failed in their Sixth Amendment duty to object the admissibility of Baldus as an expert witness and to raise this claim on appeal. In the absence of Baldus' testimony, there's a reasonable probability that the outcome would have been different, on the grounds that it is an established law in the Second Circuit that it may overturn the exercise of a district court's discretion regarding the admission or exclusion of expert testimony, where the decision is "manifestly erroneous." See United States v. Tutino, 883 F.2d 1125, 1134 (2d Cir 1989).

Ground Four Supplement: Hobbs Act Violates 10th Amendment

I. The Hobbs Act "Any Way Or Degree" Nexus
   Violates Tenth Amendment Under Bond
   v. United States (Bond II)

This claim is raised in light of the Supreme Court's recent
decision in Bond v. United States (Bond II). The issue at hand
concerns robbery activities (and their attempts) regulated
under the Hobbs Act that obstructs, affects, or delays
interstate commerce in [any way or degree]. The problem with
this is that, [if] the Act is interpreted to prosecute [all]
robberies and their attempts that obstructs, delays or affects
commerce in [any way or degree], then the Hobbs Act
dramatically would be intruding upon traditional State
criminal jurisdiction, because virtually all local robberies
has the potential to create some interstate connection. Such
sweeping reading of the Hobbs Act would fundamentally upset
the Constitution's balance between national and local power,
and without clear definition that it targets noneconomic
commerce, is an unconstitutional expansion of the Federal
Government's power and an infringement upon States
jurisdiction. See United States v. Atcheson, 94 F.3d 1237 (9th
Cir 1996)(assuming, without explanation, that the Hobbs Act is
directly aimed at economic activities); see also, United
States v. Kebodeaux, 133 S.Ct 2496, 186 L. Ed 2d 559 (2013),
acknowledging that "Congress may not regulate noneconomic
activity based on the effects it might have on interstate
commerce." In Morrison, the Supreme Court rejected the

argument that Congress may regulate noneconomic violent criminal conduct based solely on that conduct aggregate effect on interstate commerce. 529 U.S. at 617. The Court have explained in Bass v. United States, 404 U.S. at 349, that Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States (reemphasized in the Court's recent decision in Bond v. United States, (Bond II)).

Not everything that affects commerce is regulation of it within the meaning of United States Constitution. The Legislative history of the Hobbs Act is replete with evidence that Congress passed the statute to combat economic highway robberies by labor union members. See Cong. Rec at 11917 ("I want the farmers of this Nation protected from hijacking, robbery, and assault when they deliver milk from NJ to NY, or produce from SC to NY") (Rep Rivers); 91 Cong. Rec. 11843 (1943) ("It is the duty of Congress to protect its citizens and the people who use the highways in interstate commerce"). If the Hobbs Act can virtually reach Gunn's conduct (attempted robbery of illegal marijuana business), for which the Government presented no evidence to demonstrate (1) the alleged type of marijuana to determine where it came from or, (2) that the victim was engaged in marijuana originating from outside New York State, it could mark a dramatic departure from that constitutional structure and a serious reallocution of criminal law enforcement authority between the Federal Government and the States. In light of the Supreme Court's recent decision in Bond v. United States (Bond II), Gunn

argues that under the Necessary and Proper Clause, it is not necessary and proper to carry into execution a legislative Act to protect illegal marijuana dealers or their proceeds. Congress lacks authority to legislate if the objective cannot be carried out within the scope of the Constitution. When a law enacted by Congress for carrying into execution the Constitution's commerce clause (Art I, §8, cl 18), violates the principle of state sovereignty that is reflected in various constitutional provisions, the law is (1) not a law "proper" for carrying into execution the commerce clause, and (2) thus, merely an act of usurpation which deserves to be treated as such. Here, the end served by the Hobbs Act (at least, where a noneconomic illegal marijuana business is concerned), is not within the scope of the [C]onstitution. The Hobbs Act sweeps too broadly, with the [any way or degree] interstate nexus element, which is violative of the Tenth Amendment.

Wherefore, Mr. Gunn respectfully request of this Court to grant him leave to file this Supplement in support of his previously filed § 2255 Petition.

Respectfully submitted

_R. Gunn_                    Dated: June 12, 2014.

Roderick Gunn

# EXHIBIT A

8/25/09

PROFFER: DERRILYN NEEDHAM
PRES Δ, AUSA O'DONNELL, DEF. ATTY GREENFIELD, S/AS ZARNIOTT & WILSON

WICKHAM - EARLY JAN
Δ TOLD BY DONNA BARNETT THAT HER BABY'S FATHER & VICT.
"HUSTLE" TOGETHER SELLING WEED

- PETRIANNE SEXUALLY ABUSED IN JM - MOTHER PROSTITUTED HER
TO OLDER MEN - ACCORD TO MICHELLE - REASON FOR COMING TO US

VICT. WAS "BJON" - OWNED JAMAICAN REST. - V/O BURKE
& CENGEL Δ BOUGHT FOOD THERE ONCE.

- PETRIANNE TOLD MICHELLE THAT VICT HAS $ - MICHELLE
TELLS Δ - Δ TALKS W/ PETRIANNE ABOUT $ (B) - ALSO
Δ TALKS W/ B - B IN ROCHESTER

- B TALKS W/ PETRIANNE & CALLS Δ BACK - AGREED TO DO      B KNEW PEOPLE
TELLS Δ TO CALL ZAPPA & GET SOME PEOPLE -              WHO SAID TARGET
                                                        WAS DRUG DLR -
                                                        FAIRLY BIG ( HAD
- Δ CALLS ZAPPA - ZAPPA AGREES TO DO                   PEOPLE )

- DAY PRIOR TO INCID, AT B'S DIRECTION, PETRIANNE STAYED
W/ Δ IN MANHATTAN - PETRIANNE TOLD Δ THAT $
WAS IN SAFE.

*D. Needham*
**3532-9**

## WICKHAM



— PETRIANNE ALDRIDGE — APPROACHES △ w/ JOBS — SLEEPING w/
TARGET WHO KEPT $ IN SAFE — DRUG DLR.

— TARGET HAD FRIEND "BLACK" — IN HOUSE DAY OF
INCID — BABY FATHER OF "DONNA" — PASSED AWAY
(KINGS CTY. HOSP)



— △ CALLS B w/ JOB — B IN ROCHESTER

— B CAME TO NYC NEXT DAY — B SPOKE w/ PETRIANNE — B
SAID HE'D DO JOB w/ ZAPPA

— DAY PRIOR, PETRIANNE STAYED w/ △ ON AMST (JOHN'S
HSE) — △ WAS PHONE CONV (EVENING) w/ B —
B SAID HE'D KILL ("TURN THEM OVER") OCCUPANTS TO PROTECT PETRIANNE

— △ CALLS ZAPPA AFTER CONV w/ B & TELLS ZAPPA
THAT B IS PLANNING ON KILLING PEOPLE IN HOUSE —
ZAPPA STILL AGREED TO DO JOB

— DAY OF INCID, △ & JOHN DROP PETRIANNE AT PAY
PHONE NR. 237 ST. △ & JOHN GO TO FRIEND
GLORIA'S HSE — B CALLS △ & SAYS TO GO
BACK & PICK PETRIANNE UP ON WICKHAM

# EXHIBIT B

PCT: _____  UF61#: _____  SQD CASE#: _____  ③

**PRIV. HOUSE**

LOCATION: WICKHAM AVE. NR. NEREID - BX   DATE: EARLY 2003   TIME: 7-8 PM

WHO SET UP JOB: INGRID (ZAPPA TOLD Δ) — INFO. CAME FROM MR. B'S NIECE

PERPS: Δ, INGRID, ZAPPA, MR. B, BIRDIE, JOHN, MR. B'S NIECE

_____

WHAT VEHICLE WAS USED:
1. DK. BLUE MAXIMA
2. BLACK LINCOLN TOWN CAR
3. RED SENTRA
4. GRN ACURA

WHO DROVE:
1. MR. B
2. Δ (REG. IN CT UNDER NIGEL JOWSON BRIDGEPORT CT)
3. ZAPPA
4. JOHN

DID ANYONE USE WALKIE-TALKIES: CELL PHONE

HOW MANY WEAPONS: UNK.   WHO HAD THEM: UNK.

HOW ENTRY WAS MADE: MR. B'S NIECE LEFT DOOR OPEN AFT MALE LEFT

WHO WAS IN THE HOUSE/APT: 2 MALES RETURNED TO HOUSE @ DIFFERENT TIMES

WHAT WERE YOU LOOKING FOR: MONEY

WHAT DID YOU GET: WATER BOTTLE W/ MONEY INSIDE (BILLS)

WHERE WAS IT FOUND: VICT.'S GIRLFRIEND'S HOUSE.

WHAT DID YOU DO WITH THE PROPERTY: SPLIT (INGRID GAVE Δ # 100.00)

DID ANYONE ASSAULT OR TORTURE THE OCCUPANTS: MR. B SHOT MALE

HOW WERE THE OCCUPANTS RESTRAINED: UNK.

OTHER DETAILS: ZAPPA CALLED Δ — WANTED Δ TO GO ON ROBBERY THAT (NGRII & MR. B ARE GOING TO DO. Δ MET ZAPPA AT BURGER KING ON BOSTON RD. — BIRDIE THERE. ZAPPA TOLD Δ WHERE ROBBERY LOC. WAS. BIRDIE WENT W/ Δ — DRIVE TO LOCATION. Δ SEES ZAPPA'S CAR PARKED — SEE MR. B EXIT PARKED CAR. Δ PARKS— SEES INGRID'S CAR DRIVING UP & DOWN BLOCK. Δ SEES MALE EXIT TARGE HOUSE- GET IN WHITE CAR & DRIVE OFF. Δ SEES INGRID'S CAR PULL I/F/O TARG. HO? GIRL EXITS & GE'S IN INGRID'S CAR- PULLS OFF. ZAPPA & MR. B GO IN HOUSE.

# EXHIBIT C

UNITED STATES OF AMERICA v.
ALTON DAVIS, RODERICK GUNN

VOLUME 3
April 21, 2010

Page 397

[1] to the same hospital. One would go to one and one would go to
[2] the other hospital.
[3] Q. Did Mr. Davis tell you about anything that happened while
[4] he was at the hospital?
[5] A. He told me that some cops came from a precinct that he knew
[6] and they knew him and he told them he made up a story about how
[7] he got the gunshot in his arm.
[8] Q. Did Mr. Davis tell you anything about the story that he
[9] made up to the police?
[10] A. He said he told the police that because they were aware
[11] that he was beefing with some guys and that he was walking by a
[12] certain area and where the guys are known to frequent and the
[13] guys opened up and shot on him and that is how he got shot.
[14] Q. Ms. Needham, did Mr. Davis say anything to you about what
[15] happened to the gun that he used that day?
[16] A. Yes.
[17] Q. What did he say about that?
[18] A. He gave it to Suzette to keep.
[19] Q. Did you know what kind of gun it was?
[20] A. No.
[21] Q. Ms. Needham, do you know, was Bobby Socks at all involved
[22] in this robbery?
[23] A. No, he was not.
[24] Q. Did you ever talk to Bobby Socks about the robbery?
[25] A. No.

Page 398

[1] Q. Did anyone ever tell you that they had spoken to Bobby
[2] Socks about planning the robbery?
[3] A. No.
[4] Q. After the robbery, did you have any conversations with
[5] Mr. Davis about Bobby Socks?
[6] A. Yes, I did.
[7] Q. Was that one conversation or more than one conversation?
[8] A. More than one.
[9] Q. What did Mr. Davis say to you about Bobby Socks?
[10] A. He wanted to locate Bobby Socks because he was planning on
[11] killing him.
[12] Q. Did he say why he was planning on killing him?
[13] A. Because he shot him.
[14] Q. Did you ever have any conversations with Mr. Davis about
[15] Lenox Barnes?
[16] A. Yes, I did.
[17] Q. Was it one conversation with Mr. Davis about Lenox Barnes
[18] or more than one conversation?
[19] A. More than one.
[20] Q. What did Mr. Davis say to you about Lenox Barnes?
[21] A. He was telling me about a rumor he heard that Lenox had put
[22] out a hit on whoever had killed Stephenie.
[23] Q. Now, Ms. Needham, I want to change gears now and turn to
[24] January 2003.
[25]     Did you participate in a robberies with Mr. Davis and

Page 399

[1] Mr. Gunn during January 2003?
[2] A. Yes, I did.
[3] Q. How did you first learn about that robbery?
[4] A. I first learned about the robbery through B.
[5] Q. How did you learn about the robbery from Mr. Davis?
[6] A. He called me up and he told me that my niece, Michelle
[7] Wind, had told him that his niece, Petrianne, told him about
[8] some older guy she was dating and that the guy was a drug
[9] dealer and thatshe had seen on more than one occasion the guy
[10] taking money from a safe in a home she would go visit him at
[11] and putting money in the safe.
[12] Q. How old was Mr. Davis' niece?
[13] A. 15.
[14] Q. And he was passing along information he learned from his
[15] niece?
[16] A. Yes, he was.
[17] Q. What did Mr. Davis tell you was his niece's relationship to
[18] the person that would be robbed?
[19] A. She was sleeping with him.
[20] Q. What was his demeanor like when he told you that?
[21] A. I couldn't tell because we were talking over the phone.
[22] Q. Was his voice loud and angry?
[23] A. No.
[24] Q. What did Mr. Davis tell you he had learned that the person,
[25] the robbery target, did for a living?

Page 400

[1] A. He sold drugs.
[2] Q. Did you know the particular person that Mr. Davis was
[3] talking about?
[4] A. No.
[5] Q. What was your response when Mr. Davis called you and
[6] proposed this robbery?
[7] A. My response was, you know, like I was down with it.
[8] Q. When you say you were down with it, what does that mean?
[9] A. I was willing to go along with what he was doing.
[10] Q. Did Mr. Davis tell you where he was when you were speaking
[11] to him on the phone?
[12] A. He was in Rochester.
[13] Q. Ms. Needham, did you speak to Mr. Davis about this robbery
[14] once or more than once?
[15] A. We spoke more than once.
[16] Q. Do you recall how many times?
[17] A. No. But we spoke more than once, a couple of times.
[18] Q. Ms. Needham, did you speak to Mr. Gunn about this potential
[19] robbery?
[20] A. Yes.
[21] Q. Did you speak to Mr. Gunn once or more than once?
[22] A. More than once.
[23] Q. Were there any face-to-face meetings between you,
[24] Mr. Davis, and Mr. Gunn concerning this potential robbery?
[25] A. No.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Roderick Gunn
*(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)*

- against -

United States of America

*(In the space above enter the full name(s) of the defendant(s)/respondent(s).)*

14 Civ. 3228 (WHA) (JLC)

**AFFIRMATION OF SERVICE**

I, Roderick Gunn _____, declare under penalty of perjury that I have
*(name)*

served a copy of the attached Motion For Leave to Supplement 2255
*(document you are serving)*

upon AUSA John O'Donnell _____ whose address is One
*(name of person served)*

Saint Andrew Plaza, New York, N.Y 10007
*(where you served document)*

by first class mail
*(how you served document: For example - personal delivery, mail, overnight express, etc.)*

Dated:  Atwater ,  CA
        *(town/city)*   *(state)*

        June          16 , 2014
        *(month)*    *(day) (year)*

R. Gunn
Signature U.S.P Atwater
P.O. Box 019001
*Address*
Atwater   CA
*City, State*
95301
*Zip Code*

_____
*Telephone Number*

*Rev 05/2007*

legal mail

◇55254-054◇
Roderick Gunn
United State Penitentiary
P.O. Box 019001
Atwater, CA 95301
United States

◇55254-054◇
Pro Se Office
500 Pearl ST
Room 230
NEW YORK, NY 10007
United States

USMS PVDNY

PRO SE OFFICE

JUN 2 0 2014



